IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 39016-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TRAVIS LEE PADGETT, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

COONEY, J. — Travis Padgett was convicted of five counts of rape of a child in the third degree, two counts of child molestation in the third degree, three counts of incest in the first degree, two counts of distributing a controlled substance to a minor and one count of communicating with a minor for immoral purposes. His case has involved multiple appeals and, most recently, a personal restraint petition (PRP) raising numerous claims.

We dismissed most of Mr. Padgett's PRP claims but remanded two claims to the trial court for a reference hearing and a decision on the merits. Those claims concerned (1)

whether evidence surrounding one child victim's statements made in relation to a dependency proceeding amounted to a *Brady*[1] violation or newly discovered evidence warranting relief, and (2) whether Mr. Padgett's trial attorney rendered ineffective assistance by deciding not to call a specific witness at trial. Our remand order directed the trial court to answer five questions related to these two claims.

In answering the five questions, the trial court resolved the two claims and concluded neither warranted relief. Mr. Padgett appeals the trial court's findings of fact and conclusions of law entered after the reference hearing and advances several arguments as to why the trial court erred in resolving those claims.

As to the first claim, Mr. Padgett contends the court misapplied the newly discovered evidence analysis and improperly limited discovery. He also asks this court to conduct an independent in-camera review of one victim's dependency files. As to the second claim, Mr. Padgett contends the court erred by excluding the witness from testifying at the reference hearing and by concluding that the record established neither deficient performance by defense counsel nor prejudice. In addition, Mr. Padgett advances several alternative theories for relief, including a claim that his PRP attorney was ineffective. Mr. Padgett raises further issues in a statement of additional grounds for review (SAG). The State generally responds that the trial court correctly denied relief on Mr. Padgett's remaining PRP claims.

---

[1] *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

We largely agree with the State and affirm. Although some of the trial court's findings of fact and conclusions of law are imprecise or erroneous, the unchallenged findings and the overall record support the trial court's denial of relief on both remaining PRP claims and do not show an abuse of discretion in the court's discovery or evidentiary rulings. We also decline to review issues falling outside the scope of this appeal and conclude that Mr. Padgett's SAG does not raise any issue warranting relief.

## BACKGROUND

In May 2012, H.M., then 14 years old, was removed from his mother's care after he reported abuse by his mother and her partner, and was placed with his biological father, Mr. Padgett.

In January 2013, H.M. reported to a school resource officer that Mr. Padgett was sexually abusing him and providing him with methamphetamine. *State v. Padgett*, No. 32927-5-III (Wash. Ct. App. Mar. 2, 2017) (unpublished), https://www.courts.wa.gov/opinions/pdf/329275_unp.pdf. The resource officer had H.M. speak with Detective Curtis Oja of the Yakima Police Department's Special Assault Unit. *Padgett*, slip op. at 2. Detective Oja obtained a warrant authorizing the search of Mr. Padgett's home after H.M. told him about having sexual contact with Mr. Padgett and Mr. Padgett's female guests. *Id*.

Officers executing the warrant found a 14-year-old girl, K.S., in the home. *Id*. K.S. met Mr. Padgett through her friend, who K.S. claimed was Mr. Padgett's methamphetamine

3

dealer. *Id*. K.S. had been at Mr. Padgett's home for two days, engaged in oral sex with Mr. Padgett and an adult female, and ingested methamphetamine provided by Mr. Padgett. *Id*. at 2-3. K.S. agreed to be interviewed at the police department and, based on that interview, was transported to the hospital for a sexual assault examination. *Id*. at 3.

Days after the search, Detective Oja was contacted by a family member of one of Mr. Padgett's victims, J.J., a friend of H.M who is of a similar age. *Id*. The family member was concerned J.J. might have been sexually assaulted because he spent time at Mr. Padgett's home. *Id*. Detective Oja interviewed J.J. *Id*.

In an amended information filed in August 2013, the State charged Mr. Padgett with 14 counts involving the three minors. Concerning H.M., Mr. Padgett was charged with three counts of rape of a child in the third degree (counts 1, 3, and 5), three counts of incest in the first degree (counts 2, 4, and 6), and one count of distributing a controlled substance to a minor (count 8). Related to K.S., Mr. Padgett was charged with one count of communicating with a minor for immoral purposes (count 7) and one count of distributing a controlled substance to a minor (count 9). Concerning J.J., Mr. Padgett was charged with three counts of child molestation in the third degree (counts 10, 12, and 14), and two counts of rape of a child in the third degree (counts 11 and 13). Mr. Padgett's case was tried to a jury trial in October 2013. *Id*. at 4. Attorney Kenneth Raber represented Mr. Padgett at trial. Deputy Prosecuting Attorney (DPA) Patti Powers prosecuted the case for the State.

4

At trial, H.M. testified that Mr. Padgett first initiated sexual contact with him during a camping trip attended by Mr. Padgett's girlfriend, Rhonda Pedersen. He explained that Mr. Padgett and Ms. Pedersen engaged in sexual activity in his presence, Mr. Padgett directed Ms. Pedersen to touch H.M.'s penis, and Mr. Padgett requested that H.M. penetrate Mr. Padgett anally.

H.M. testified that Mr. Padgett later engaged in sexual contact with him and escalated to repeated incidents involving pornography, drug use, group sex, restraints, and sex toys. H.M. claimed Ms. Pedersen participated in many of these encounters. H.M. testified Mr. Padgett and Ms. Pedersen also frequently involved J.J. in their sexual activities and recalled seeing Mr. Padgett go with K.S. into a room and close the door.

J.J. testified that he first observed Mr. Padgett and H.M. having sex and then later became involved himself. J.J. explained that Ms. Pedersen was often present and participated in the sexual activities, in addition to other women.

K.S. testified that Mr. Padgett gave her methamphetamine and performed oral sex on her once. K.S. explained that she was present at Mr. Padgett's house on multiple occasions with adult friends who also engaged in sexual activity with Mr. Padgett. During cross-examination, K.S. acknowledged that, contrary to her earlier testimony, she had previously told defense counsel that she was having oral sex with another one of her adult friends, not Mr. Padgett.

After K.S. testified, DPA Powers told the court and defense counsel that she was

concerned K.S.'s mother may have influenced K.S.'s testimony. DPA Powers reported:

> Detective Oja has advised me that [K.S.'s] mother contacted her in Seattle. She has supervised visitations at the facility that [K.S.] is at. She had access to her and spoke with her about trying to get on the same page.
>
> The concern we have is that that seems to reference her testimony. . .
>
> . . . .
>
> [K.S.] this morning indicated that her mother wanted to talk to her about the case. We're not sure at this point what this means, but there could be some impact on her testimony. That's the concern that we have. We'll be speaking with her before 1:00 and trying to address that.

Ex. A5 at 1108-09.

Following trial, the jury found Mr. Padgett guilty of 13 counts, acquitting him of one

count of rape of a child in the third degree (count 14 related to J.J.), and returned special

verdicts finding aggravating factors of pattern of abuse and domestic violence. The court

sentenced Mr. Padgett to an exceptional sentence of 360 months of confinement.

Mr. Padgett moved for a new trial through a new attorney, Robert Thompson, and

asserted, among other grounds, that Attorney Raber was ineffective for failing to call Ms.

Pedersen as a witness during trial. Attorney Raber had intended to call Ms. Pedersen as a

witness, presumably because she denied participating in any sexual contact with H.M. and

J.J. and was not charged with any related criminal offense. In connection with the motion,

Mr. Padgett subpoenaed Attorney Raber's client file, any related audio tapes, any Child

Protective Services (CPS) records, and copies of all communications with Mr. Padgett.

6

Attorney Raber moved to quash the subpoena, arguing it was untimely and the request was unduly burdensome. Attorney Raber also moved to withdraw from representing Mr. Padgett.[2] The trial court quashed the subpoena and later granted Attorney Raber's motion to withdraw.[3]

Attorney Raber explained in a declaration authored around this time that, although he initially planned on calling Ms. Pedersen to testify, he decided against calling her after the prosecutor brought a recorded jail telephone call between Mr. Padgett and Ms. Pedersen to his attention. Attorney Raber alleged that Mr. Padgett and Ms. Pedersen discussed "in detail the testimony of all the prosecution witnesses" during the telephone call. Clerk's Papers (CP) (No. 39016-1-III)[4] at 436. Based on the telephone call, Attorney Raber believed Ms. Pedersen would be a "problematic" witness and that the recorded conversation destroyed her credibility. CP (No. 39016-1-III) at 436.

Accepting Attorney Raber's characterization of the call, the trial court ultimately denied Mr. Padgett's motion for a new trial. The court concluded, in relevant part, that Attorney Raber's decision not to call Ms. Pedersen was a legitimate tactical decision given the information revealed in the call.

---

[2] Neither a copy of this motion nor a transcript from the related hearing are included in the record.

[3] A copy of this decision is not in the record.

[4] We cite documents from both this case (36016-1-III) and Mr. Padgett's previous personal restraint petition (36170-5-III). We will include the relevant cause number for each document cited.

Mr. Padgett appealed his convictions.[5] This court reversed the conviction for delivery of a controlled substance (count 8 related to H.M.) for insufficient evidence but otherwise affirmed. *Id.* at 29. On remand, the trial court resentenced Mr. Padgett to the same exceptional sentence of 360 months.

Following his direct appeal, Mr. Padgett continued requesting Attorney Raber's client and discovery file to prepare a PRP. The trial court denied Mr. Padgett's motion to compel and subsequent motion for reconsideration.

Mr. Padgett appealed the denials of his motions and this court reversed, holding that Mr. Padgett was entitled to access his client file and discovery materials. *State v. Padgett*, 4 Wn. App. 2d 851, 854-56, 424 P.3d 1235 (2018).[6] In November 2018, the trial court ordered Attorney Raber to produce the file. By this time, Mr. Padgett had already filed his PRP with Attorney Thompson's assistance and asserted claims of ineffective assistance of counsel and *Brady* violations to avoid the one-year time-bar. *See* RCW 10.73.090. When the trial court ordered Attorney Raber to produce the files, Mr. Padgett requested an extension to file an amended PRP that was ultimately granted.

---

[5] *Padgett*, No. 32927-5-III (Wash. Ct. App. Mar. 2, 2017).

[6] Mr. Padgett later appealed from his amended judgment and sentence in this case. *State v. Padgett*, No. 36487-9-III (Wash. Ct. App. Dec. 19, 2019) (unpublished), https://www.courts.wa.gov/opinions/pdf/364879_unp.pdf. This court remanded the case for the trial court to strike the DNA collection fee and correct scrivener's errors but otherwise affirmed. *Padgett*, No. 36487-9-III, slip op. at 8.

In early 2019, Attorney Raber began transmitting the file in installments to Mr. Padgett who was incarcerated at the Airway Heights Corrections Center (AHCC). The third installment included a volume of Attorney Raber's trial notebook and eight CDs/DVDs. These items were received by the AHCC on February 8, 2019, as confirmed by an AHCC employee's signature on a receipt form. The form indicated the items would be "retained for 3 months after the last level of administrative or final court appeal." CP (No. 39016-1-III) at 602.

That same day, Mr. Padgett sent a kite asking how to view the CDs. Five days later, a Department of Corrections (DOC) employee responded, "The CDs were returned to the mailroom for rejection. Review policy 590.500 pg 6, IV. Legal media for criteria info." CP (No. 39016-1-III) at 604.

The next day, Mr. Padgett sent a kite appealing the mail rejection and explaining that the materials were his client file sent under court order. The DOC denied Mr. Padgett's appeal, explaining, "[L]egal mail not sent by a court, prosecuting attorney DOC, or [the Indeterminate Sentencing Review Board]. These files were sent to a facility by your attorney, does not meet the criteria setforth by policy 590.500." CP (No. 39016-1-III) at 608.

On February 21, 2019, Mr. Padgett again sent a kite appealing the DOC's decision:

> Please, I require these CD's to complete my PRP in the Court of Appeals. The court gave me a 60 day continuance for PRP so that I may amend my PRP with info learned from those CD's as part of my client file.

CP (No. 39016-1-III) at 611.

Around this time, Attorney Thompson returned from a lengthy trial in King County to find that the DOC had sent notice that it was denying Mr. Padgett access to the CDs. Attorney Thompson then obtained an order from the trial court directing the DOC to allow Mr. Padgett to review the CDs. The order indicated that the parties agreed to inform the DOC of the ruling. Nevertheless, Mr. Padgett later learned that the DOC disposed of the CDs on May 1, 2019.

It is unclear, however, whether the jail call Attorney Raber claimed to have listened to before deciding not to call Ms. Pedersen to testify was lost before Mr. Padgett's file was transferred from Attorney Raber to Attorney Thompson, or whether it was later destroyed by the DOC.

Mr. Padgett asserted multiple grounds for relief in his PRP. Relevant here, Mr. Padgett asserted that (1) newly discovered evidence demonstrated that K.S. had recanted her trial testimony and that the State failed to disclose that evidence in violation of *Brady*, and (2) that Mr. Padgett's trial attorney rendered ineffective assistance by failing to call Ms. Pedersen as a witness.

In support of his claim regarding K.S., Mr. Padgett submitted two letters K.S. wrote as part of her separate dependency proceeding. In an April 2014 letter, K.S. responded to the allegations in the dependency petition, stating, in relevant part:

10

> Mary [Flores[7]], Neil [Cotner[8]], Kim [Foley[9]] have all lied to me. I have
> followed all their requests and went to all the treatments.

Pers. Restraint Pet. (PRP) (36170-5-III) at 56.

> My parents have never failed to keep me safe and they never let me go w/
> unsafe adults and I was never exploided [sic]. Was never in a dangerous
> environment.

PRP (36170-5-III) at 56-57.

In a May 2014 letter, K.S. wrote:

> I . . . was not sexually assaulted by . . . Travis Padgett.
>
> . . . .
>
> My parents have never failed to take action to keep me safe. They have
> always kept me from unsafe situations and have never let me stay with
> unsafe adults. No one exploited me while in custody of my parents. My
> parents are able and willing to keep me safe in their care. My parents did
> everything to keep me out of dangerous environments/situations. I have
> good parents that are not guilty in anyway of neglect. I have been
> neglected of my education my family, my physical, mental and oral health
> and everything that matters in life by being in the custody of the state.
>
> I have been held in the states [sic] custody to testify at a criminal trial that
> has nothing to do with my parents ability to keep me safe or adequately
> care for me. I've been lead to believe that my friends and parents are bad
> and unsafe people which in fact they are NOT . . . Travis Padgett . . . [has]
> never hurt me or assaulted me in any way. I was threatened with Juvy if I
> did not testify against Travis Padgett the way they wanted me to also if I
> did not go to treatment. Social worker supervisor Neil Cotner has told me
> that he is my new parent and I have do do [sic] whatever he says . . . He

---

[7] Mary Flores was K.S.'s social worker through her dependency case.

[8] Neil Cotner was Mary Flores' supervisor.

[9] Kim Foley was K.S.'s victim advocate during Mr. Padgett's trial. She worked at Central Washington Comprehensive Mental Health.

> would not consider letting me return home or with family.  He has searched my phone and lied to me.  Social worker Mary has also lied to me about going home with parents or relatives and put me in dangerous situations.  She has denied visitation with my family against the court order, Allowed [sic] Kim Foley from Comprehensive Mental health to manipulaite [sic] me for the Travis Padgett trial and take me to her house and to appointments.

PRP (36170-5-III) at 50, 53.  Mr. Padgett also submitted supportive declarations from K.S.'s mother and from Gregg Hires, a social worker (SW).

K.S.'s mother alleged in her declaration that the police and CPS "tricked" her and K.S.'s father into sending K.S. to a treatment facility because they intended to "use" her to testify against Mr. Padgett.  PRP (36170-5-III) at 389.  K.S.'s mother claimed Advocate Foley threatened K.S. with juvenile detention if she did not testify.  K.S.'s mother also alleged that Detective Oja threatened to arrest her if she watched K.S. testify.  K.S.'s mother wrote that Advocate Foley was "coaching and grooming" K.S. to testify against Mr. Padgett, even though K.S. had denied that Mr. Padgett touched her or gave her drugs.  PRP (36170-5-III) at 387.  K.S.'s mother concluded her declaration by explaining that K.S. made "recantations" before Mr. Padgett was sentenced and those statements were not provided to Attorney Thompson, Mr. Padgett's PRP counsel.  PRP (36170-5-III) at 391.

In his declaration, SW Hires similarly declared that K.S. denied Mr. Padgett committed the charged acts and that K.S. felt threatened by Advocate Foley.  SW Hires asserted that he specifically told Advocate Foley and her supervisor, Neil Cotner, that K.S. recanted.

Mr. Padgett further submitted an e-mail thread between Detective Oja, SW Flores, Advocate Foley, and Kim Loranz (an assistant attorney general (AAG) representing the Department of Children, Youth, and Families (DCYF) and CPS). In the primary e-mail, Detective Oja explained to SW Flores that he was concerned K.S.'s mother attempted to influence either K.S.'s trial or dependency testimony and that he warned K.S.'s mother that she could face criminal sanctions for attempting to influence K.S.'s testimony. Mr. Padgett alleged that this e-mail thread showed that the prosecution knew of and concealed K.S.'s "recantation" in violation of *Brady*. PRP (36170-5-III) at 396.

In support of his ineffective assistance claim based on Attorney Raber's decision not to call Ms. Pedersen to testify at trial, Mr. Padgett submitted declarations from Attorney Raber and Attorney Thompson.

In a December 2018 affidavit, Attorney Raber declared that he, along with the assistance of Private Investigator (PI) Gary King, investigated Mr. Padgett's case and prepared for trial. Attorney Raber explained that, while he initially "endorsed" Ms. Pedersen as a witness, he became more concerned with her credibility as he prepared for trial. PRP (36170-5-III) at 248. Because he had trouble locating Ms. Pedersen, Attorney Raber had to obtain a material witness warrant to compel her appearance. Attorney Raber explained that in the midst of trial he was advised of a recorded jail call between Ms. Pedersen and Mr. Padgett in which they discussed the "trial and testimony of witnesses." PRP (36170-5-III) at 248. Attorney Raber "became concerned that had [he] called Ms.

Pedersen to the witness stand, [he] could not be certain as to what she would testify to" and that the prosecutor would damage the case by alluding Mr. Padgett was tampering with the case. PRP (36170-5-III) at 248. Attorney Raber concluded, "Considering . . . the impact of the cross-examination of [the prosecutor], and the unpredictability of Ms. Pederson's testimony, I made a decision not to call her as a witness." PRP (36170-5-III) at 249.

However, Attorney Thompson declared he listened to over 20 hours of audio recordings during his preparation for Mr. Padgett's PRP and "did not hear the offending phone call." PRP (36170-5-III) at 508.

In January 2020, this court considered and dismissed most of Mr. Padgett's PRP claims as frivolous but concluded that the two claims mentioned above warranted further factual development. Order Dismissing Pers. Restraint Pet. in Part and Transferring for a Hr'g and Determination on the Merits, *In re Pers. Restraint of Padgett*, No. 36170-5-III, at 13-14 (Wash. Ct. App. Jan. 28, 2020). Accordingly, this court transferred the case to the trial court for a RAP 16.12 reference hearing and instructed the court to answer five questions related to Mr. Padgett's two remaining claims:

> 1. Does the evidence surrounding K.S.'s recantation rise to the level of a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)?
>
> 2. Does the evidence surrounding K.S.'s recantation meet the newly discovered evidence standard for relief under *State v. Williams*, 96 Wn.2d 215, 634 P.2d 868 (1981)?
>
> 3. If the answer to either question 1 or 2 is affirmative, then what counts are affected and what is the proper remedy as to those counts?

4. Has Mr. Padgett shown that no reasonable lawyer would have made the same decision to not have Rhonda Pedersen testify?

5. If so, has Mr. Padgett shown that the outcome of his trial, on all or some of the counts, likely would have been different had Ms. Pedersen testified?

The superior court shall also permit the parties to address other factual matters pertinent to the above questions and shall make a thorough record.

Order Dismissing Pers. Restraint in Part at 13. This court ordered the superior court to "enter findings of fact and conclusions of law that decide on the merits the remainder of the petition" and noted that any appeal of the trial court's decision following the reference hearing would be an appeal pursuant to RAP 2.2(a)(9).[10] Order Dismissing Pers. Restraint in Part at 14.

The defense filed a proposed witness list and synopsis of each witnesses's anticipated testimony in advance of the reference hearing. The defense anticipated Ms. Pedersen would "testify to phone calls with Padgett that Raber never listened to and government intimidation tactics by threatening her with criminal violations of the law." CP (No. 39016-1-III) at 687. The State moved to exclude several of the defense's listed witnesses, including Ms. Pedersen, and to limit the scope of the testimony at the hearing.

Around the same time, Mr. Padgett issued subpoenas for K.S.'s records from Central Washington Comprehensive Mental Health (CWCMH), where Advocate Foley was employed, and for records from the Yakima Police Department involving Detective Oja and

---

[10] RAP 2.2(a)(9) provides that a party may generally appeal from a superior court "order granting or denying a motion for a new trial."

15

K.S.'s dependency social workers.  Mr. Padgett also filed a motion to compel discovery, seeking K.S.'s dependency records, records from CWCMH and correspondence among members of the prosecution team.

The trial court held a hearing on the motions.  Attorney Thompson argued during the hearing that the e-mail thread between Detective Oja, SW Flores, Advocate Foley, and AAG Loranz showed the prosecution was working with K.S.'s dependency case workers to help develop K.S.'s testimony.  Attorney Thompson explained that K.S.'s mother provided K.S.'s letters to the defense after the Yakima Police Department failed to disclose the e-mail in response to a public records request.

Following the hearing, the court quashed Mr. Padgett's subpoenas and denied his motions as overly broad and unsupported by the record.  However, the court granted Mr. Padgett "leave to renew" his request for additional discovery at the close of the reference hearing.  CP (No. 39016-1-III) at 94.  The court explained:

> The Court hues to its prior inclination, which is to deny the motion with leave to renew in specific areas, based on the development of the testimony during the reference hearing.  Individuals can be asked whether there are email exchanges, between whom, when they were sent, and when things were known . . .
>
> So, I'll deny with leave to renew as to those other issues and we'll just see how the testimony comes in.

Supp. Tr. of Proc. (Mar. 21, 2022) at 113-14.

The court largely granted the State's motion to exclude some defense witnesses and limit the scope of certain testimony, offering specific rationales for each ruling.  For those

witnesses the court excluded or limited, the court permitted the defense the opportunity to "renew" its request with an offer of proof.[11] CP (No. 39016-1-III) at 97. Relevant to the issues in this appeal, the court granted the State's motion to exclude Ms. Pedersen, deeming her testimony "irrelevant" but also allowing defense the opportunity to renew its request. CP (No. 39016-1-III) at 97.

At the reference hearing, the State presented testimony from K.S., Attorney Raber, AAG Loranz, DPA Powers, Paralegal Investigator Cecilia Barajas of the Yakima Prosecutor's Office Victim Witness Assistance Unit, Detective Oja, and PI King. The defense presented testimony from K.S.'s mother, SW Hires, Gayelynn Davis, who was employed at CWCMH at the time of Mr. Padgett's trial, and Mr. Padgett.

K.S. testified first. She affirmed her trial testimony that Mr. Padgett had given her methamphetamine and performed oral sex on her. When shown copies of her dependency letters and asked about their purpose, K.S. stated that she was "[j]ust trying to go home." Verbatim Rep. of Proc. (VRP) (Apr. 11, 2022) at 26. When asked why she denied that Mr. Padgett sexually assaulted her in her letter, K.S. explained that she "didn't think it was sexual assault back then because [she] never told him yes, you can do this or, no, you can't." VRP (Apr. 11, 2022) at 29. When asked about her statement in her letter that she was not exploited, K.S. explained that she now realizes she was being exploited. K.S. testified that

_____

[11] Mr. Padgett sought discretionary review of these decisions and a stay of the reference proceedings. Both requests were denied.

she did not intend the letters to be inconsistent with her trial testimony. K.S. also denied giving copies of the letters to anyone involved in Mr. Padgett's criminal case, including the prosecution.

K.S. testified that she was reluctant to testify at Mr. Padgett's trial and was concerned about feeling embarrassed and family members being present. K.S. clarified that her social workers had threatened her with juvenile detention if she did not testify, and she was under a subpoena when she wrote the letter. K.S. also clarified that the judge overseeing her dependency case threatened her with juvenile detention if she did not complete substance abuse treatment. When asked about the statements in her letters that Advocate Foley manipulated her, K.S. explained that she now felt as an adult like she was not being manipulated at the time and was instead being pushed to "speak up." VRP (Apr. 11, 2022) at 121. K.S. added, however, that no one forced her trial testimony.

DPA Powers testified that she was unaware of K.S.'s dependency proceedings at the time of Mr. Padgett's trial and had never seen the dependency letters before the PRP litigation. DPA Powers added that she would have immediately disclosed the letters to the defense had she been aware of them. Paralegal Barajas similarly testified that she had not seen the dependency letters before her preparation for the reference hearing.

Detective Oja testified that at the time of Mr. Padgett's trial, he was generally aware K.S. was involved in dependency proceedings but had not seen the dependency letters before the morning of his reference hearing testimony. When asked about the

e-mail thread between him and K.S.'s dependency social workers, Detective Oja explained that it was standard procedure to share concerns about child welfare with CPS and that he had concerns about K.S.'s mother's ability to protect K.S.

AAG Loranz testified that CPS is generally independent of the prosecutor's office and does not share dependency files with law enforcement, absent a written referral. AAG Loranz stated that she did not receive the e-mail thread, and, if she had received it, she would not have given it to a prosecutor because it is confidential and protected by statute. *See generally* RCW 13.50.100.

K.S.'s mother testified that SW Flores and Supervisor Cotner heard K.S. deny that Mr. Padgett engaged in oral sex with her or provided her methamphetamine during family team decision meetings associated with K.S.'s dependency case. Ms. Davis testified that she recalled K.S. telling her that "she was being told that she would never go home unless she testified against Mr. Padgett." VRP (Apr. 19, 2022) at 585-86. Ms. Davis recalled reporting this to SW Flores, who told her not to worry about it.

Approximately one year before the reference hearing, the State sent its "jail call evidence" to the defense, consisting of two jail call recordings from October 17 and 18, 2013, a Thursday and Friday during Mr. Padgett's trial. CP (No. 39016-1-III) at 559. At the outset of Attorney Raber's reference hearing testimony, however, the parties quickly established that neither recording was the recording Attorney Raber claimed to have listened

to before declining to call Ms. Pedersen to testify. Regardless, defense counsel agreed to proceed with the reference hearing.

Attorney Raber testified about his decision not to call Ms. Pedersen as a witness at trial. Attorney Raber explained that the day he started presenting the defense's case, DPA Powers gave him a CD containing what he remembered to be one recorded jail call. Attorney Raber testified that he listened to the call with his investigator and became concerned that Ms. Pedersen's testimony could be detrimental to Mr. Padgett's case. Attorney Raber then explained that he was concerned Ms. Pedersen gave favorable statements to the police after they picked her up from a psychiatric ward in Spokane on a material witness warrant. Attorney Raber also explained that he could not predict what Ms. Pedersen would say based on her "uncommunicative" and "simple answers" during trial preparation, which were not what he was expecting. VRP (Apr. 11, 2022) at 141. Finally, with regard to the jail call at issue, Attorney Raber admitted he did not remember exactly what was on the recording but generally recalled "discussion as to what the testimony of witnesses was during the course of trial." VRP (Apr. 11, 2022) at 142. Attorney Raber thought DPA Powers might have "had some other information in addition to that tape and [he] did not know what it was and in any event [he] didn't want it to come out." VRP (Apr. 11, 2022) at 142.

Detective Oja recalled listening to multiple jail calls between Mr. Padgett and Ms. Pedersen during trial and that the pair discussed Ms. Pedersen's anticipated trial

testimony during one of the calls. After hearing this, Detective Oja gave a CD containing the recording to DPA Powers.

After the two jail call recordings were played in court, PI King testified that neither call was the same call that Attorney Raber claimed he listened to before deciding not to call Ms. Pedersen as a witness. PI King clarified that while the two recordings were similar to the missing recording, they were not the same. He recalled that Attorney Raber intended to put Ms. Pedersen on the stand, but that after listening to the missing jail call recording, he felt Ms. Pedersen was "tainted because of things she had been told of testimony of prior witnesses." VRP (Apr. 18, 2022) at 443.

DPA Powers testified that she was told about a jail call between Mr. Padgett and Ms. Pedersen during trial. DPA Powers recalled relaying this information to Attorney Raber but did not recall listening to the call or giving Attorney Raber a CD containing the recording. After telling Attorney Raber about the call, DPA Powers recalled Attorney Raber said he would not call Ms. Pedersen and something about "witness tampering." VRP (Apr. 12, 2022) at 215.

Mr. Padgett testified that Attorney Raber initially intended to call Ms. Pedersen but decided against it because of the problematic recorded jail call. Mr. Padgett said that Attorney Raber never played him the call recording or discussed what was concerning about the call with him.

At the close of evidence, Attorney Thompson moved for "additional discovery" and asked the court for an in-camera review of K.S.'s dependency files, H.M.'s dependency files, and the Yakima Police Department's "retention file." VRP (Apr. 19 - 20, 2022) at 631, 644. In balancing "the interests of the parties and the privacy interests," the court agreed to an in-camera review of only K.S.'s dependency files. VRP (Apr. 20, 2022) at 647. The court told the parties it would inform them if it found anything relevant and would allow the parties to make additional argument following its in-camera review.

Following its review of K.S's 1,675-page dependency records, the court found one e-mail from Detective Oja—the e-mail thread that had been previously admitted. The court determined that the records contained no evidence that the Yakima Police Department, prosecution team, and the DCYF were acting in concert.

At the end of the reference hearing, the trial court announced its findings and conclusions relative to our remand questions. The reference court then entered its written findings of fact and conclusions of law.

In answering the first three questions, the superior court concluded: (1) K.S.'s dependency letter statements did not amount to recantations and there was no *Brady* violation, (2) K.S.'s statements did not constitute newly discovered evidence and that, even if they did, it would not satisfy the factors necessary to obtain relief, and (3) because neither the first nor second question were answered in the affirmative, there was no remedy

22

available as to counts 7 and 9 (communication with a minor for immoral purposes and distribution of a controlled substance to a minor).

In answering the last two questions, the reference court concluded: (4) Attorney Raber's decision to not call Ms. Pedersen to testify at trial did not fall below an objective standard of reasonableness; thus, Mr. Padgett's claim of ineffective assistance failed, and (5) Mr. Padgett failed to show that the outcome of his trial, on some or all of the counts, would have been different had Ms. Pedersen testified.

Mr. Padgett moved for reconsideration that was ultimately denied. Mr. Padgett timely appeals the court's reference hearing decision.

ANALYSIS

RECANTATION, *BRADY* VIOLATION, AND NEWLY DISCOVERED EVIDENCE

We begin by analyzing the parties' arguments relating to the questions this court asked the trial court to answer on remand, starting with remand questions 1, 2, and 3, related to K.S.'s alleged recantations, potential *Brady* violation, and newly discovered evidence. In response to these questions, the trial court entered the following findings of fact and conclusions of law:

> **Court of Appeals Question 1. Does the evidence surrounding K.S.'s recantation rise to the level of a violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)?**
>
> 2.1    After the Court completed an in-camera review of the Department of Children, Youth and Families' documents (hereafter "The Department") consisting of 1675 pages, there was only one email in the file from Detective Oja. It has previously been admitted.

2.2     Contacts with law enforcement were essentially limited to the period when K.S. was listed as a runaway, which started in early 2014 and last approximately a year and a half. There were minor single direction reports from law enforcement to the Department.

2.3     The Department's file contained a matter-of-fact report where the victim stated sex act(s) had occurred with Mr. Padgett. K.S. did not see the problem with having oral sex with Mr. Padgett. Her statements in the reports were consistent with the victim's testimony in the Reference Hearing. The 2013 report was contemporaneous with the events described within days.

. . . .

2.5     There was no recantation. K.S. came into the courtroom on the first day of the Reference Hearing and was shown a copy of the transcript from the 2013 trial. K.S. reviewed it and stated that it was true and accurate.

. . . .

2.7     Recantation has been so broadly applied to the whole universe of complaints. When reviewed in detail, particularly Exhibit 2A and Exhibit 3A. These exhibits are not specific recantations of the acts that formed the basis of the charges here. They are general statements.

    2.7.1   Exhibit 2A is a statement written hy K.S. and is dated April 4, 2014

    2.7.2   Exhibit 3A is a statement written by K.S. and is dated May 11, 2014

2.8     Teenagers are well-known for creating distinctions in terminology without a difference. There are "infinite amounts" of individuals/groups of individuals who engage in sex acts that are not penile/vaginal intercourse and convince themselves that those acts are not sexual acts.

2.9     The Court found during an in-camera review of the Departments' documents, there was a contemporaneous statement from K.S. where she says, "yeah. It happened. It's not a problem."

2.10    The co-location of agencies (i.e. the CPS desk located within the YPD Special Assault Unit) could create a concern that the lines are not being adhered to. The Court found no evidence within the 1675 pages that

24

they reviewed in-camera, express or implied, that YPD or the Department were acting in concert in any way.

**Court of Appeals Question 2. Does the evidence surrounding K.S.'s recantation meet the newly discovered evidence standard for relief under *State v. Williams*, 96 Wn.2d 215, 634 P.2d 868 (1981)?**

2.11   The letters/documents do not meet the definition of a recantation as outlined in *State v. Landon*.[12]

2.12   Exhibits 2A and 3A were discovered after State v. Travis Padgett trial had taken place in 2013.

2.13   There is no record of when [K.S.'s mother] received the letters or how they came to be in her possession.

2.14   There was a clear self-interest for [K.S.'s mother] in trying to clear her name to preserve her occupation.

2.15   The Prosecution team consisted of Deputy Prosecuting Attorney Powers, Paralegal Investigator Barajas and Detective Oja, not the Department.

**Court of Appeals Question 3.  If the answer to either question 1 or 2 is affirmative, then what counts are affected and what is the proper remedy as to those counts?**

2.16   Only counts 7 and 9 are affected by these questions as those are the only counts that pertain to K.S.

2.17   Counts 7 and 9 do not carry any aggravators or sentencing enhancements.

2.18   It is difficult to say whether the presence or absence of any additional offenses (i.e. Count 7 and Count 9) would affect a trial judge in ultimately determining the consecutive sentencing on the rape of child and incest convictions.  The majority of the sentencing that Mr. Padgett received in 2014 and 2018 was focused on the other counts, not on Counts 7 and 9.

---

[12] 69 Wn. App. 83, 848 P.2d 724 (1993).

Having entered the above findings of fact, the Court now reaches the following [conclusions of law]:

. . . .

3.1     *State v. Landon*, 69 Wash.App 83 (1993) is the controlling law as to what is a recantation. Black's Law Dictionary defines recant as "to withdraw or repudiate formally and publicly." Landon states that a recantation to have any legal effect, should be made while under oath and subject to recall, citing to *Powell*, 51 Wash. at 737 (1909).

3.2     Because the victim K.S. testified at the Reference Hearing stating that the transcript from the 2013 trial was all true and correct, under *Landon*, this Court's inquiry regarding the issue of recantation is ended.

3.3     This Court concludes that even considering a broader test than *Landon.* Exhibit 2A and Exhibit 3A are insufficiently specific and they come with obvious bias of the speaker or the person gathering them.

3.4     Under *Brady*, the State has an ongoing duty to provide the defense with material exculpatory evidence within its possession. The duty extends to information possessed by law enforcement, or other members of the "prosecution" team.

3.5     There was no evidence in the 1675 pages from the Department/dependency files that law enforcement had violated either of the statutes, nor anything showing some sort of combined action.

3.6     Under *Brady,* the Court finds that Deputing Prosecuting Attorney Powers, Detective Oja and Paralegal Investigator Barajas are the team. There were no violations of the confidentiality statutes that would bring the Department in. Communications were essentially one-way; they were not working together.

3.7     There were no *Brady* violations.

. . . .

3.8     Under *Williams*, a new trial based on newly discovered evidence "will not be granted on that ground unless the moving party demonstrates that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before

trial by the exercise of due diligence; (4) is material; and (5) is not merely cumulative or impeaching. *Williams* at 223.

3.9     The Court concludes the following for each of the five factors set forth above:

3.9.1     There was no recantation so there is no newly discovered evidence to change the result of the trial. The Court concludes that, even if there were a different rule as to what a recantation is, taking everything together, the outcome of the trial would have remained the same. Especially noting the particularly clear self interest of [K.S.'s mother] and her occupation. The Court cannot see the letters would have changed the outcome of trial.

3.9.2     Exhibit 2A and 3A were discovered after the trial.

3.9.3     It is unclear when [K.S.'s mother] received the letters, that were in her possession, from the Department. The Court also concluded that the Department was not part of the prosecution team. This cannot be held against the defense as they would not have had a way to get the materials in question.

3.9.4     The evidence is potentially material to the extent that it could impeach a witness' statement. It is not collateral, so that standard has been met.

3.9.5     The evidence is not cumulative. It is merely impeaching, so then it's not material by implication.

3.10     Even if the Court were to conclude there was a recantation, it would not satisfy 3 of the 5 factors outlined in *State v. Williams*.

3.11     There is no newly discovered evidence and therefore no relief to be granted.

. . . .

3.12     Only counts 7 and 9 are affected by these questions, as those are the only counts that pertain to K.S.

3.13     Neither question 1 nor 2 were answered in the affirmative.

3.14    Since the Court has not found a *Brady* violation nor has it determined there is newly discovered evidence under *Willaims*, there is no remedy available as to counts 7 and 9. It does not meet either of those standards.

CP (No. 39016-1-III) at 76-80.

"A personal restraint petitioner bears the burden of proving issues in a reference hearing by a preponderance of the evidence." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 679, 101 P.3d 1 (2004). Our review of challenged factual findings is limited to determining whether the findings are supported by substantial evidence, and if so, whether the findings support the conclusions of law and judgment. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 410, 972 P.2d 1250 (1999). "'Substantial evidence exists when the record contains evidence of sufficient quantity to persuade a fair-minded, rational person that the declared premise is true.'" *Davis*, 152 Wn.2d at 679-80 (internal quotation marks omitted) (quoting *Gentry*, 137 Wn.2d at 410). We do not review a trial court's credibility determinations on appeal, "even to the extent there may be other reasonable interpretations of the evidence." *Id.* at 680. Unchallenged findings of fact are verities on appeal. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997). We review issues of law de novo. *State v. Macon*, 128 Wn.2d 784, 799, 911 P.2d 1004 (1996).

With respect to K.S.'s statements, the trial court was presented with two different questions: did the State fail to disclose *Brady* material and did the statements qualify as newly discovered evidence? Under *Brady*, the State has an ongoing duty to provide the defense with material exculpatory evidence within its possession. *State v. Wittenbarger*,

28

124 Wn.2d 467, 475, 880 P.2d 517 (1994). This duty extends to information "possessed by law enforcement as well." *State v. Mullen*, 171 Wn.2d 881, 894, 259 P.3d 158 (2011). To establish a *Brady* violation, a defendant must demonstrate the existence of three necessary elements: "'[ (1) ] the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [ (2) ] that evidence must have been suppressed by the State, either willfully or inadvertently; and [ (3) ] prejudice must have ensued.'" *Id.* at 895 (alterations in original) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)).

Regardless of whether a *Brady* violation occurred, the evidence surrounding K.S.'s dependency statements could separately merit relief under the newly discovered evidence standard. A new trial based on newly discovered evidence "will not be granted on that ground unless the moving party demonstrates that the evidence (1) will probably change the result of the trial; (2) was discovered since the trial; (3) could not have been discovered before trial by the exercise of due diligence; (4) is material; *and* (5) is not merely cumulative or impeaching." *State v. Williams*, 96 Wn.2d 215, 223, 634 P.2d 868 (1981). The absence of any one of the factors is grounds for the denial of a new trial. *State v. Gassman*, 160 Wn. App. 600, 609, 248 P.3d 155 (2011).

Critically, a witness's recantation may be considered newly discovered evidence. *Macon*, 128 Wn.2d at 799-800. However, a recantation is inherently suspect and "'does not necessarily, or as a matter of law, entitle the defendant to a new trial.'" *Id*. at 801 (quoting

*State v. Wynn*, 178 Wash. 287, 288-89, 34 P.2d 900 (1934)).  Thus, the trial court must

initially make a threshold determination on whether the recantation is reliable.  *Id*. at 804.  If

the recantation is not reliable, then it is not material, as required by the fourth *Williams*

factor.  *Id*.  The movant has the burden of demonstrating the truthfulness of the recantation

by a preponderance of the evidence.  *State v. Eder*, 78 Wn. App. 352, 358, 361, 899 P.2d

810 (1995).

In making the threshold reliability determination, the superior court is allowed to

consider the circumstances surrounding the case, including the possible reason for recanting,

the circumstances under which the recantation was made, the time between the testimony

and the recantation, and the credibility of the witnesses testifying about the recantation.

*Macon*, 128 Wn.2d at 802-03.  The court, not a jury, determines the recanting witness's

credibility.  *State v. Ieng*, 87 Wn. App. 873, 880, 942 P.2d 1091 (1997).

Mr. Padgett does not dispute the trial court's findings and related conclusions that

K.S.'s statements in her letters did not qualify as recantations.  Nor does he offer any

argument regarding the trial court's findings and conclusions that there were no *Brady*

violations.[13]  Rather, Mr. Padgett challenges the trial court's analysis and determination that

K.S.'s dependency letters did not constitute newly discovered evidence.  Each is discussed

in turn.

---

[13] For these reasons, we decline to analyze the State's arguments relative to the
recantation and *Brady* violation issues.

*In-court recantation*

As a threshold matter, the State argues Mr. Padgett's claim fails because K.S. did not provide an in-court recantation at the reference hearing. The State contends that a recantation is unreliable and not material under *Williams* if it is not an in-court recantation. The State notes that we directed the trial court in our remand order to make this threshold determination and stated that, if the recantation was not reliable, it would not be material under *Williams*. The State therefore argues the absence of an in-court recantation is dispositive. The State further suggests that because Mr. Padgett's PRP claim is specifically based on evidence of a recantation, he should not be allowed to now argue that K.S.'s "recantation adjacent statements" constitute newly discovered evidence. Br. of Resp't at 51.

Mr. Padgett replies, arguing that the State reads our remand order too narrowly. He does not dispute the trial court's findings that K.S.'s dependency letters were not formal recantations. Instead, he argues our remand order separately asked whether K.S.'s statements met the newly discovered evidence standard. Thus, in Mr. Padgett's view, the absence of a formal recantation did not end the inquiry because K.S.'s statements still had to be evaluated under *Williams*. Relatedly, Mr. Padgett argues the trial court misapplied the *Williams* factors by treating the absence of a formal recantation as dispositive of the newly discovered evidence inquiry.

We agree with the State. Generally, an unsworn out-of-court statement is not the equivalent of an in-court recantation and does not trigger the right to a new trial. *See State*

31

*v. Landon*, 69 Wn. App. 83, 92, 848 P.2d 724 (1993).  Here, it is unchallenged that K.S.'s

out-of-court statements (the dependency letters) were not recantations.  Nevertheless, Mr.

Padgett is also correct that our remand order directed the trial court to separately determine

whether the statements and evidence surrounding the statements constituted newly

discovered evidence warranting relief under *Williams*.  Thus, to the extent the trial court

treated the lack of a formal recantation as automatically ending the newly discovered

evidence inquiry, that reasoning was erroneous.

*Newly discovered evidence—*Williams *factors*

Regardless of K.S. not making an in-court recantation, the trial court made

alternative determinations that K.S.'s statements were not newly discovered evidence

warranting relief because they failed to satisfy the first and fifth *Williams* factors—that the

evidence was merely impeaching and would probably not change the result of the trial.[14]  If

---

[14] Related to this issue, Mr. Padgett assigns error to conclusion of law 3.10, that even if the trial court concluded there was a recantation, it would not satisfy "3 of the 5 [*Williams*] factors."  CP at 80.  Mr. Padgett contends the court actually found three factors satisfied, and the court therefore could not have found three factors unsatisfied.  We are unpersuaded by this argument.  The trial court found only factors two and three were satisfied.  Although the court initially concluded the evidence was "potentially material," it later clarified that the evidence "is merely impeaching, so then it's not material by implication."  CP at 80; *see also* VRP (May 16, 2022) at 702 (the court clarifies that it found three of the five factors unsatisfied).  Thus, the court's conclusion of law 3.10 was not erroneous.

Relatedly, based on his belief that the trial court found the fourth *Williams* factor (materiality) satisfied, Mr. Padgett does not offer argument regarding the factor.  The State, on the other hand, argues that this factor is unsatisfied.  Because the trial court's decision primarily revolved around the first and fifth factors, we confine our analysis to those factors.

either factor is not satisfied, then the trial court's denial was proper. *See Gassman*, 160 Wn. App. at 609. We therefore analyze the parties' arguments relative to each factor.

Addressing the fifth *Williams* factor first, Mr. Padgett contends the trial court erred in concluding that the evidence was merely impeaching. Instead, Mr. Padgett argues the evidence went to K.S.'s motives and biases in testifying against him. He asserts the evidence showed that K.S. testified under "duress" and was "coerced" to testify by threat of "incarceration and indefinite separation from her parents." Appellant's Br. at 109-10.

The State argues the trial court correctly concluded the evidence was merely impeaching because Mr. Padgett's intended use of the letters and surrounding testimony was to undermine K.S.'s credibility by showing inconsistent statements and bias or motive to testify. The State emphasizes that bias and motive are classic impeachment themes. We agree with the State.

Impeachment evidence is "'evidence used to undermine a witness's credibility.'" *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 488 n.7, 276 P.3d 286 (2012) (quoting BLACK'S LAW DICTIONARY 637 (9th ed. 2009)). Normally, newly discovered impeachment evidence will not support a motion for a new trial. *See Williams*, 96 Wn.2d at 223. However, impeachment evidence "'can warrant a new trial if it devastates a witness's uncorroborated testimony establishing an element of the offense. In such cases the new evidence is not merely impeaching, but critical.'" *State v. Roche*, 114 Wn. App. 424, 438, 59 P.3d 682 (2002) (quoting *State v. Savaria*, 82 Wn. App. 832, 838, 919 P.2d 1263

33

(1996)). *But see In re Pers. Restraint of Fero*, 190 Wn.2d 1, 18, 409 P.3d 214 (2018) (plurality opinion) (Merely "strengthening the defense's trial theory is not the standard for newly discovered evidence.").

K.S.'s dependency statements and the surrounding evidence are merely impeaching. Undoubtedly, Mr. Padgett would use the letters as prior inconsistent statements to attack K.S.'s credibility. *See* ER 607, 613. He also expressly argues the evidence shows K.S.'s bias, motive, and pressure to testify. Regardless, impeachment by showing bias, prejudice, or motive is still impeachment. *See Davis v. Alaska*, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974).

Likewise, Mr. Padgett does not persuasively show that this is one of the rare cases where the impeachment evidence is so powerful that it devastates K.S.'s trial testimony. Unchallenged, and therefore verities, are the trial court's findings that K.S.'s dependency letters were not actual recantations, K.S. affirmed her trial testimony, and contemporaneous dependency records reflect that K.S. reported Mr. Padgett's sexual conduct within days of the encounter. These verities support the conclusion that the letters and surrounding evidence were merely impeaching and not so critical as to devastate K.S.'s trial testimony. We therefore conclude the fifth *Williams* factor is not satisfied, and that, accordingly, the trial court's denial of relief was proper.

Because one of the *Williams* factors is not satisfied, our inquiry could conclude. *See Gassman*, 160 Wn. App. at 609. Nevertheless, we proceed to an analysis of the parties' arguments on the first *Williams* factor.

Regarding the first factor, Mr. Padgett contends the trial court erred in concluding that K.S.'s written statements would not have changed the outcome of trial. He argues that had the jury heard that K.S. felt pressured to testify, it would have "created serious doubts as to whether to credit K.S.'s testimony." Appellant's Br. at 110-11. Mr. Padgett also argues the outcome of trial would have changed had the jury seen K.S.'s statements that she had not been assaulted by him.

The State responds that the trial court correctly concluded the dependency letters and surrounding evidence would not probably change the result of trial. It highlights that K.S. reaffirmed her trial testimony, provided credible explanations regarding the inconsistencies in her statements, and clarified that she had not been coerced into testifying. We agree with the State.

A new trial based on newly discovered evidence will not be granted unless the moving party demonstrates that the evidence will probably change the result of the trial. *Williams*, 96 Wn.2d at 223 (factor one). "[T]he standard is 'probably change,' not just possibly change the outcome." *Gassman*, 160 Wn. App. at 609 (quoting *Williams*, 96 Wn.2d at 223).

As discussed above, the trial court's unchallenged findings—that K.S.'s dependency letters were not actual recantations, K.S. affirmed her trial testimony at the reference hearing, and contemporaneous dependency records reflect that K.S. reported Mr. Padgett's sexual conduct within days of the encounter—support the court's conclusion that the evidence would probably not have changed the result of trial.

The same holds true for Mr. Padgett's argument that the letters would have created serious doubt in the jury because the letters suggested K.S. felt pressured to testify against Mr. Padgett. Although the trial court did not enter a specific finding on every statement in the letters, K.S. clarified at the reference hearing that the letters were written while she was trying to return home to her parents and while social workers were warning her that, because she was under subpoena, she could face juvenile detention if she refused to testify. Given these explanations, we conclude that, while the letters' suggestions of pressure to testify might *possibly* have affected the jury's assessment of K.S.'s credibility, they would not *probably* have changed the result of trial. Accordingly, because the first *Williams* factor is not satisfied, the trial court's denial of relief was proper.

Because the trial court's conclusions that there were no recantations and no *Brady* violations are unchallenged, and because the court correctly concluded there was no newly discovered evidence warranting relief under *Williams*, the court's ultimate conclusion—that

36

there is no relief available as to counts 7 and 9—was correct.[15]

*Additional discovery into Detective Oja's communications*

Mr. Padgett contends the trial court erred by limiting discovery into Detective Oja's communications with "other government actors," including records from the Yakima Police Department and CWCMH. Appellant's Br. at 112. He argues Detective Oja's knowledge was central to his *Brady* theory and that broader discovery was necessary to determine whether Detective Oja and other dependency-related personnel were coordinating with regard to K.S.'s testimony.

The State responds that the reference court permitted reasonable discovery under RAP 16.12 and acted within its discretion in denying Mr. Padgett's requests as overbroad and insufficiently supported. The State emphasizes that (1) the court allowed targeted development of the Detective Oja issue through testimony, exhibits, and in-camera review of K.S.'s dependency records; (2) the challenged subpoena requests were overbroad and implicated procedural and privacy concerns; and, (3) even after further development of the record, the court reasonably concluded broader discovery was not warranted. We agree with the State.

---

[15] Accordingly, Mr. Padgett's assignment of error to conclusion of law 3.14 also fails. ("Since the Court has not found a *Brady* violation nor has it determined there is newly discovered evidence under *Williams*, there is no remedy available as to counts 7 and 9. It does not meet either of those standards." CP at 80).

RAP 16.12 provides that when this court transfers a PRP back to the trial court, "[t]he parties, on motion, will be granted reasonable pretrial discovery." Generally, "we review trial court evidentiary decisions, including decisions on discovery, for abuse of discretion." *State v. Grenning*, 169 Wn.2d 47, 57, 234 P.3d 169 (2010). "[W]e give great deference to the trial court's determination: even if we disagree with the trial court's ultimate decision, we do not reverse that decision unless it falls outside of the range of acceptable choices because it is manifestly unreasonable, rests on facts unsupported by the record, or was reached by applying the wrong legal standard." *State v. Curry*, 191 Wn.2d 475, 484, 423 P.3d 179 (2018).

Here, the court acted within its discretion in denying Mr. Padgett's broader discovery and subpoena requests. The court viewed those requests as overbroad, expressed concern about whether the subpoenas complied with procedural and notice requirements, and noted the need to balance discovery against the confidentiality and privacy interests implicated by the requested records. On appeal, Mr. Padgett does not offer any argument as to why these specific rulings were an abuse of discretion or otherwise erroneous. "Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration." *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998).

More importantly, the record reveals the trial court did not prevent Mr. Padgett from developing the Detective Oja issue. The defense elicited testimony from Detective Oja and others concerning what the prosecution team knew about K.S.'s dependency statements and

38

whether Detective Oja had communications with K.S.'s dependency social workers. The defense also introduced the principal e-mail thread on which Mr. Padgett relied to show possible coordination between Detective Oja and the dependency social workers. Of great significance, the court reviewed 1,675 pages of K.S.'s dependency records in-camera to determine whether those records reflected broader coordination or undisclosed knowledge on Detective Oja's part.

Given that record, the trial court could reasonably conclude broader discovery into the Yakima Police Department and CWCMH files was unnecessary absent some more concrete showing that additional material communications likely existed. The existence of the e-mail thread involving Detective Oja did not require the court to authorize sweeping discovery into all of his communications. The court was entitled to treat that e-mail as a basis for targeted inquiry, not limitless discovery. After considering the testimony and conducting in-camera review, the court found no evidence that the Yakima Police Department and the DCYF were acting in concert. On this record, Mr. Padgett has not shown the court's limitation of additional discovery related to Detective Oja was an abuse of discretion.

Thus, even with Mr. Padgett's renewed request, the trial court's decision to limit discovery into Detective Oja's communications did not fall outside the range of acceptable choices. We therefore conclude the trial court did not abuse its discretion.

*In-camera review*

Mr. Padgett also requests this court independently review K.S.'s dependency files in-camera to confirm the trial court's conclusion that there was no evidence that should have been, but was not, disclosed to the defense. In response, the State urged us to reject that request because Mr. Padgett had not designated the dependency materials as part of the appellate record at the time he filed his opening brief. The State nevertheless represented that it would not have objected had Mr. Padgett timely designated the files. In reply, Mr. Padgett explains that he designated the dependency materials before filing his reply brief. He therefore asks that we conduct our own in-camera review of the materials. We grant Mr. Padgett's request and conclude, upon our own in-camera review, that the trial court's findings and conclusions are supported. Thus, we deny any relief related to the trial court's in-camera review process and related findings and conclusions.

"The appellate courts will not act as a rubber stamp for the trial court's in camera hearing process. The record of the hearing must be made available to the appellate court." *State v. Wolken*, 103 Wn.2d 823, 829, 700 P.2d 319 (1985). A defendant is entitled to appellate review of the in-camera hearing. *State v. Casal*, 103 Wn.2d 812, 822-23, 699 P.2d 1234 (1985).

Here, following our own in-camera review of K.S.'s sealed dependency case files, we conclude the trial court's findings related to its in-camera review are supported by the contents of the sealed case file. Thus, to the extent Mr. Padgett "provisionally" assigned

error to the trial court's findings and conclusions related to its in-camera review,[16] those assignments fail. Appellant's Br. at 118.

The trial court correctly denied relief under *Williams*, based on its determination that the evidence surrounding K.S.'s dependency statements was merely impeaching and would probably not change the result of trial. The trial court did not abuse its discretion when it limited and denied Mr. Padgett's requests for discovery. Finally, the trial court's findings and conclusions stemming from its in-camera review of K.S.'s dependency files are supported and no relief is warranted related to the in-camera review.

INEFFECTIVE ASSISTANCE OF COUNSEL

We next address remand questions 4 and 5, related to whether Mr. Padgett showed that Attorney Raber was ineffective for deciding not to call Ms. Pedersen to testify at trial. Relative to these questions, the trial court entered the following findings of fact and conclusions of law:

**IV. FINDINGS OF FACT AS TO INEFFECTIVE ASSISTANCE OF COUNSEL RE RHONDA PEDERSON [SIC]**

**Court of Appeals Question 4. Has Mr. Padgett shown that no reasonable lawyer would have made the same decision to not have Rhonda Pedersen testify?**

4.1   Mr. Raber is not the best historian of what occurred in 2013, therefore the Court must rely on the surrounding evidence.

---

[16] Findings of fact 2.1, 2.2, 2.3, 2.9, 2.10, and conclusion of law 3.5.

4.2    Detective Oja and Deputing Prosecuting Attorney Powers had different recollections on how the jail call got to the defense, however its clear from the record, the jail call in question did get to the defense.

4.3    It is unclear if the jail call was lost before Mr. Padgett's file was transferred from Mr. Raber to the defendant and his new defense counsel or if it was shredded by the Department of Corrections. The jail call does not exist for the Court to make a record on.

4.4    The Court heard several references to possible witness tampering, by Deputing Prosecuting Attorney Powers, Detective Oja, Defense Mr. Raber and Private Investigator Mr. King, but that is not the record before this Court, since the Court cannot listen to the actual jail call for itself.

4.5    Private Investigator Mr. King, his statements, and his notes from 2013 are the best evidence as to the content of the jail call in question.

4.6    Mr. King recalls Mr. Padgett saying he "thought the jury liked him". Because that statement is absent from the two calls played during the Reference Hearing, this confirms that the two jail calls are different than the call that Mr. King and Mr. Raber listened to during the October 2013 trial, the morning that Rhonda Pederson was expected to testify.

4.7    In the two jail calls played during the Reference Hearing, Mr. Padgett is discussing prior trial testimony with Rhonda Pederson.

4.8    Mr. Raber indicated that Pederson was monosyllabic and not communicative during his most recent communication with her.

4.9    Mr. Raber testified he did not know what Rhonda Pederson would testify to, once on the stand.

4.10   Mr. King testified that he and Mr. Raber considered Rhonda Pederson tainted because she had been informed of prior witness testimony.

4.11   Rhonda Pederson's conversations with Mr. Padgett would have been grounds for the impeachment of her entire testimony, had she taken the stand.

4.12    It does not matter if Mr. Padgett had been warned or not, as to not talking to witnesses about testimony.

4.13    Ms. Powers observed that Mr. Raber reversed course after listening to the jail call and decided to not call Ms. Pederson to testify, even though Ms. Pederson was lined up at the courthouse ready to take the stand.

Having entered the above findings of fact, the Court now reaches the following:

## V. CONCLUSIONS OF LAW AS TO INEFFECTIVE ASSISTANCE OF COUNSEL RE RHONDA PEDERSON [SIC]

**Court of Appeals Question 4. Has Mr. Padgett shown that no reasonable lawyer would have made the same decision to not have Rhonda Pederson testify?**

5.1    The Court concludes that one of Mr. Raber's reasons to not call Pederson, because she came across as monosyllabic and not communicative to defense counsel, was an insufficient basis to not call Pederson as a defense witness.  However, this factor alone does not meet the *Strickland*[17] test.

5.2    *Strickland v. Washington*, 466 U.S. 668 (1984) lays out the test for ineffective assistance of Counsel.  "To demonstrate ineffective assistance of counsel, a defendant must make two showings: (1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different."

5.3    The Court concludes the following for each of the factors set forth above:

5.3.1    The Court concludes it cannot find under the *Strickland* test that if a lawyer finds out that their client, whether warned or not, has been discussing testimony with a witness and they choose not to

---

[17] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

call that witness falls below the professional competence that no reasonable attorney would have made that same decision.

5.3.2   The Court concludes that this is a hole that the State could delve into, especially if defense thought the case was close. A reasonable attorney would not want to open that door.

5.3.3   The Court concludes it cannot use the phrase "witness tampering" without more information upon which to base a legal conclusion. Because the Court could not review the jail phone call, it cannot rule that Padgett told the witness Rhonda Pederson what to testify to, if anything.

5.3.4   The first prong of the *Strickland* test cannot be met. The actions of defense counsel did not fall below the reasonable attorney standard set forth in *Strickland*.

5.3.5   Therefore, the Court concludes that Mr. Raber's decision to not call Rhonda Pederson to testify at trial did not prejudice the defendant.

**Court of Appeals Question 5. If so, has Mr. Padgett shown that the outcome of his trial, on all or some of the counts, likely would have been different had Ms. Pedersen testified?**

5.4   Mr. Padgett has not shown that a reasonable attorney would have made a different decision in calling Ms. Pederson [sic] to testify.

5.5   Therefore, Mr. Padgett has not shown the outcome of the trial, on all or some of the counts, would have been different if Ms. Pederson had testified.

CP (No. 39016-1-III) at 80-83.

Criminal defendants have a constitutional right to effective assistance of counsel.

U.S. CONST. amend. VI; WASH. CONST. art. I, § 22; *State v. Vazquez*, 198 Wn.2d 239, 247,

494 P.3d 424 (2021). Washington courts follow the *Strickland* standard when determining

whether a defendant received ineffective assistance of counsel. *State v. Grier*, 171 Wn.2d

17, 32, 246 P.3d 1260 (2011). A defendant bears the burden of showing that (1) defense counsel's performance fell below an objective standard of reasonableness and, if so, (2) there is a reasonable probability that but for counsel's poor performance the outcome of the proceedings would have been different. *Id*. If either prong is not satisfied, the inquiry ends. *State v. Kyllo*, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).

Mr. Padgett's arguments proceed in layers. He first argues the reference court erred by excluding Ms. Pedersen's testimony at the reference hearing. He next argues the reference court's finding of fact 4.11 is unsupported by substantial evidence. From there, he contends neither the record nor the findings support the court's conclusion that Attorney Raber rendered effective assistance. Finally, he advances several alternative theories for relief, including broader consideration of other evidence, relief based on the loss of the recorded jail call, and remand for a hearing at which Ms. Pedersen may testify.

However, because resolution of this issue hinges on our review of the trial court's decision on the merits of Mr. Padgett's ineffective assistance PRP claim, we first address the trial court's decision on each prong of the *Strickland* standard.

Mr. Padgett contends the trial court erred in concluding that Attorney Raber's decision not to call Ms. Pedersen did not fall below an objective standard of

reasonableness.[18]  The State argues the trial court's conclusion was correct because Mr.

Padgett failed to show the absence of any legitimate strategic reason for Attorney Raber's

decision.  It emphasizes that the reference hearing resolved the principal factual concern

underlying remand by confirming that Attorney Raber did, in fact, listen to the recorded jail

call before deciding not to call Ms. Pedersen as a witness.  The State further argues that

Attorney Raber supplied other legitimate strategic reasons for not calling Ms. Pedersen. We

generally agree with the State.

Starting with the first prong of the ineffective assistance analysis, our analysis begins

with the strong presumption that counsel's performance was reasonable.  *State v. Carson*,

184 Wn.2d 207, 218, 357 P.3d 1064 (2015).  To overcome this presumption, the defendant

has the burden to show that counsel's performance was deficient based on the trial court

record.  *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995).  Specifically, "the

defendant must show in the record the absence of legitimate strategic or tactical reasons

supporting the challenged conduct by counsel."  *Id.* at 336.  "When counsel's conduct can

be characterized as legitimate trial strategy or tactics, performance is not deficient."  *Kyllo*,

166 Wn.2d at 862; *see also McFarland*, 127 Wn.2d at 336.

---

[18] Relatedly, Mr. Padgett assigns error to conclusion of law 5.3.1 ("The Court concludes it cannot find under the *Strickland* test that if a lawyer finds out that their client, whether warned or not, has been discussing testimony with a witness and they choose not to call that witness falls below the professional competence that no reasonable attorney would have made that same decision."  CP at 82.).  We agree that this categorical conclusion is error.  However, the trial court's separate conclusion that Mr. Padgett failed to show deficient performance in this case was correct.

"'The decision whether to call a witness is ordinarily a matter of legitimate trial tactics and will not support a claim of ineffective assistance of counsel.'" *Gassman*, 160 Wn. App. at 612 (quoting *State v. Kolesnik*, 146 Wn. App. 790, 812, 192 P.3d 937 (2008)); *see also State v. Piche*, 71 Wn.2d 583, 590, 430 P.2d 522 (1967). This is because, generally, whether a witness will assist or harm the defendant's case "depends greatly on factors and characteristics of the witness that the attorney is in a far better position to assess than a reviewing court." *State v. Robinson*, 79 Wn. App. 386, 396, 902 P.2d 652 (1995).

"Trial counsel may have legitimate tactical reasons for deciding not to introduce testimony that would open the door to other evidence that would undermine the defense theory of the case." *State v. Couch*, No. 58122-1-II, slip op. at 17 (Wash. Ct. App. June 3, 2025) (unpublished portion), https://www.courts.wa.gov/opinions (citing *In re Pers. Restraint of Mockovak*, 194 Wn. App. 310, 321, 377 P.3d 231 (2016)).

Here, the unchallenged findings support the trial court's ultimate conclusion that Mr. Padgett failed to establish any deficiencies in Attorney Raber's performance related to Ms. Pedersen's testimony. The unchallenged findings establish that Attorney Raber obtained the now-missing recorded jail call, listened to the recording, and that DPA Powers observed Attorney Raber reverse course after listening to the recording even though Ms. Pedersen was prepared to testify. Also unchallenged are the trial court's findings that Attorney Raber was uncertain what Ms. Pedersen would testify to, and that PI King and Attorney Raber both considered Ms. Pedersen "tainted" based on the recorded jail call because she had been

47

informed of the testimony of prior witnesses. CP (No. 39016-1-III) at 80-81. These verities

establish a legitimate tactic in deciding not to call Ms. Pedersen to testify. A reasonable

attorney could conclude, after listening to the recording, that whatever exculpatory value

Ms. Pedersen's testimony offered was outweighed by the risk that the State would portray

her testimony as tainted by her conversation with Mr. Padgett. Thus, the trial court's

unchallenged findings support the trial court's conclusion that Attorney Raber's actions did

not fall below the objective standard of reasonableness.[19]

Mr. Padgett's arguments to the contrary do not compel a different result. The trial

court seemed to discredit Attorney Raber's memory, finding he was "not the best historian."

CP (No. 39016-1-III) at 80. Mr. Padgett also correctly points out that the court concluded

one of Attorney Raber's proffered reasons for not calling Ms. Pedersen—her

"monosyllabic" and noncommunicative demeanor—was insufficient *alone* to justify

forgoing her testimony. CP (No. 39016-1-III) at 82. Mr. Padgett also rightly notes that the

court declined using the phrase "witness tampering" and could not determine from the

missing jail call whether Mr. Padgett told Ms. Pedersen what to testify to, if anything. CP

(No. 39016-1-III) at 82. Nevertheless, these findings and conclusions, in isolation, do not

establish deficient performance. The question under the first *Strickland* prong is whether

Mr. Padgett showed in the record an absence of a legitimate strategic or tactical reason for

---

[19] Because the trial court's unchallenged findings support its conclusion that Attorney Raber's decision was not deficient, we decline to address the State's alternative argument that Attorney Raber testified to other legitimate reasons to not call Ms. Pedersen.

deciding not to call Ms. Pedersen.  *McFarland*, 127 Wn.2d at 336.  Based on the trial court's unchallenged findings, Mr. Padgett failed to make this showing.

Likewise, any overbreadth in finding of fact 4.11's language does not change the outcome.  Mr. Padgett challenges the trial court's finding that Ms. Pedersen's conversation with Mr. Padgett during the missing jail call "'would have been grounds for the impeachment of her *entire* testimony, had she taken the stand.'"  Appellant's Br. at 75 (emphasis added) (quoting CP (No. 39016-1-III) at 81).  Mr. Padgett is correct that, because the missing jail call was never produced and the trial court could not determine whether Mr. Padgett told Ms. Pedersen what to testify to, the finding that her conversation with Mr. Padgett would have been grounds for impeachment of her "entire testimony" overstates the call's impeachment value.  CP (No. 39016-1-III) at 80.  But even if finding of fact 4.11 is overly broad, the unchallenged findings still establish a conceivable legitimate tactical reason for Attorney Raber's decision.  Specifically, after listening to the jail call, Attorney Raber and PI King regarded Ms. Pedersen as tainted because she had been informed of the testimony of prior witnesses.  This independently is sufficient to sustain the trial court's conclusion that Attorney Raber's performance was not deficient.

Similarly, the anticipated exculpatory value of Ms. Pedersen's testimony does not compel a different result.  Before trial, Ms. Pedersen provided a statement to law enforcement denying that she had sex with H.M. or sex with Mr. Padgett in H.M.'s presence, and the State likewise assumes she would have denied the allegations against Mr.

Padgett. But the potentially exculpatory testimony does not alone establish deficient performance. Again, the question is whether Mr. Padgett showed in the record an absence of a legitimate strategic or tactical reason for deciding not to call Ms. Pedersen. As discussed above, Mr. Padgett failed to make that showing. Accordingly, even accepting the substantial exculpatory potential of Ms. Pedersen's testimony, Mr. Padgett fails to rebut the strong presumption that Attorney Raber's decision was tactical.

Because Mr. Padgett failed to establish deficient performance, our ineffective assistance of counsel inquiry ends. *Kyllo*, 166 Wn.2d at 862. The trial court's findings support its conclusion that Mr. Padgett failed to establish any deficiencies in Attorney Raber's performance related to Ms. Pedersen's testimony.

*Ms. Pedersen's exclusion from the reference hearing*

Mr. Padgett argues the reference court erred by excluding Ms. Pedersen's testimony from the hearing as irrelevant. He contends Ms. Pedersen had firsthand knowledge of three subjects central to the ineffective assistance claim, specifically her jail call conversations with Mr. Padgett, her communications with Attorney Raber, and the testimony she would have given had she testified at trial. Mr. Padgett asserts that testimony was directly relevant to whether Attorney Raber acted reasonably in abandoning Ms. Pedersen as a witness and whether the jail call meaningfully undermined her value to the defense. The State responds that Mr. Padgett did not clearly articulate a relevant basis for Ms. Pedersen's testimony at

the hearing and that he never renewed the request with a more focused proffer.  We agree

with the State.

We review a trial court's evidentiary decisions for an abuse of discretion.  *State v. Demery*, 144 Wn.2d 753, 758, 30 P.3d 1278 (2001).  Evidence is "relevant" if it makes the existence of a fact of consequence more or less probable to be true than without the evidence.  *State v. Lough*, 125 Wn.2d 847, 861-62, 889 P.2d 487 (1995) (citing ER 401).

Here, Mr. Padgett sought to have Ms. Pedersen testify at the reference hearing about "phone calls with Padgett that Raber never listened to and governmental intimidation tactics by threatening her with criminal violations of the law."  CP (No. 39016-1-III) at 687.  However, the court granted the State's motion to exclude Ms. Pedersen's testimony from the reference hearing based on irrelevance, with the opportunity for defense counsel to renew the request.

Mr. Padgett fails to show that Attorney Thompson renewed the request for Ms. Pedersen to testify at the reference hearing.  This undercuts any argument that the trial court's decision to exclude Ms. Pedersen was an abuse of discretion.

Notwithstanding the lack of a renewed request, Mr. Padgett's argument fails on the merits.  The trial court could reasonably conclude, based on Mr. Padgett's offer of proof, that Ms. Pedersen's proposed testimony was not relevant to the limited remand questions.  As framed in Mr. Padgett's witness proposed synopsis, Ms. Pedersen was expected to testify about other jail calls Attorney Raber had not heard and alleged governmental intimidation

51

tactics. On that proffer, the court acted within its discretion in determining that the proposed testimony was not relevant to whether Attorney Raber acted reasonably in deciding not to call Ms. Pedersen after hearing the particular jail call that prompted him to reverse course. Accordingly, Mr. Padgett has not shown that the trial court abused its discretion in excluding Ms. Pedersen's testimony at the reference hearing.

*Ineffective assistance of Attorney Thompson*

Alternatively, Mr. Padgett contends that if this court concludes that Attorney Thompson waived any challenge to the exclusion of Ms. Pedersen's testimony by failing to renew the request to call her at the reference hearing, then Attorney Thompson rendered ineffective assistance. He argues that Attorney Thompson's failure to renew the request was deficient because Ms. Pedersen's testimony became more important once the missing jail call could not be produced, and that failure prejudiced him because either the reference court would have allowed Ms. Pedersen to testify or the issue would at least have been more cleanly preserved for appeal. The State responds that this claim fails, even assuming Mr. Padgett may raise it. We generally agree with the State.

Assuming, without deciding, that Mr. Padgett may assert an ineffective assistance claim against his PRP attorney, his claim fails because he cannot establish prejudice based on this case's procedural posture. To establish prejudice, Mr. Padgett must show a reasonable probability that, had Attorney Thompson renewed the request to call Ms. Pedersen to testify, the reference court would have answered remand questions four and five

differently—i.e., that it would have concluded that Attorney Raber performed deficiently in not calling Ms. Pedersen and that the outcome of trial would have been different had she testified. *See Strickland v. Washington*, 466 U.S. 668, 694-95, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).; *McFarland*, 127 Wn.2d at 337.

Mr. Padgett fails to show prejudice under either version of his prejudice argument. First, Mr. Padgett does not show a reasonable probability that, had Attorney Thompson renewed the request, the trial court would have allowed Ms. Pedersen to testify and then answered remand questions four and five differently. Mr. Padgett contends that, if the court had granted a renewed request, it would have heard "Pedersen's account of the missing jail call and its effect on her anticipated testimony at Padgett's trial in 2013." Appellant's Br. at 104. Mr. Padgett's theory is too speculative to establish prejudice. The record does not clearly establish what Ms. Pedersen's testimony at the reference hearing would have been beyond the defense's broad proffer that she would testify about jail calls Attorney Raber had not heard and alleged governmental intimidation tactics.

Likewise, Mr. Padgett has not shown a reasonable probability that such testimony would have changed the trial court's ultimate conclusions. As discussed above, the court's findings support its conclusion that Attorney Raber had a conceivable legitimate tactical reason for not calling Ms. Pedersen. Moreover, even assuming Ms. Pedersen would have offered strongly exculpatory testimony, the trial court's findings do not compel the conclusion that her testimony likely would have changed the outcome of trial in light of the

impeachment concerns created by the jail call. Indeed, even if we speculate that Ms. Pedersen's testimony at the reference hearing would have been exculpatory, that testimony would not necessarily dispel Attorney Raber's impeachment concerns based on the jail call. Thus, Mr. Padgett cannot show a reasonable probability that, had the court granted a renewed request and permitted Ms. Pedersen to testify, the court would have concluded either that Attorney Raber performed deficiently or that the outcome of trial would have been different.

Second, Mr. Padgett fails to establish prejudice by arguing that renewal would have preserved the issue for appeal. He fails to explain how error preservation is a relevant prejudice inquiry under *Strickland*. Nevertheless, the question is whether counsel's alleged deficiency probably affected the result of the reference hearing—the trial court's answers to our remand questions four and five—not whether it would have preserved the issue for appeal. *See McFarland*, 127 Wn.2d at 337.

Because Mr. Padgett fails to establish prejudice, his ineffective assistance of counsel claim against Attorney Thompson fails.

### *Mr. Padgett's other arguments outside the scope of this appeal*

Mr. Padgett advances alternative theories for relief that extend beyond the narrow remand questions before this court. These theories include: (1) a request that we consider other evidence submitted with the PRP relative to the dismissed PRP claims or later obtained through public record requests to establish prejudice on his ineffective assistance

claim against Attorney Raber; and (2) a broader claim that a decade of governmental misconduct and penalizing him for the loss of the jail call violated his constitutional rights to petition for habeas corpus and to access the courts.

The State argues we should decline to review these arguments because they fall outside the scope of this appeal, which is limited to the five questions identified in the remand order. Alternatively, the State requests an opportunity to submit supplemental briefing should this court choose to address these arguments.

In reply, Mr. Padgett clarifies that he is not asking this court to reopen previously dismissed PRP claims as independent bases for relief. Rather, he requests we consider the evidence associated with those claims, together with later-obtained evidence, insofar as that evidence bears on prejudice with respect to the remaining ineffective assistance claim against Attorney Raber. He also argues his access to the courts and habeas corpus arguments fall within the scope of this appeal because they were raised in the reference proceedings, preserved below, and arise directly from the loss of the jail call central to the preserved ineffective assistance issue. Last, Mr. Padgett urges us to deny the State's request to submit supplemental briefing. We generally agree with the State.

This appeal arises from the reference court's answers to the five remand questions discussed above. Our review is limited to whether the reference court correctly resolved Mr. Padgett's two remaining PRP claims on the record developed for that purpose. Mr. Padgett's broader requests—that we consider other PRP evidence related to his dismissed

PRP claims to establish prejudice, revisit other alleged deficiencies by Attorney Raber, or recognize independent constitutional claims based on access to the courts or habeas corpus—exceed the scope of our focused review.

This court's remand order did not direct the reference court to evaluate prejudice by considering or making findings on evidence associated with other dismissed ineffective assistance theories, nor did it direct the court to adjudicate separate constitutional claims. Rather, the order was limited to the specific questions concerning K.S.'s alleged recantation and Attorney Raber's decision not to call Ms. Pedersen as a witness at trial, while allowing development only of "other factual matters pertinent" to those five questions. CP (No. 39016-1-III) at 554.

Because we reject Mr. Padgett's arguments outside the scope of this appeal, we decline addressing the State's alternative request to submit supplemental briefing.

The trial court correctly concluded that Attorney Raber did not provide deficient performance. The trial court did not abuse its discretion when it excluded Ms. Pedersen's testimony from the reference hearing. Attorney Thompson was not ineffective for failing to renew the request for Ms. Pedersen's testimony at the reference hearing. Finally, Mr. Padgett's remaining arguments are outside the scope of this appeal.

STATEMENT OF ADDITIONAL GROUNDS FOR REVIEW (SAG)

Under RAP 10.10(a), a defendant may file a statement of additional grounds for review. However, our review of a SAG is subject to several limitations. First, we generally

consider only issues raised in a SAG that adequately inform us of the nature and occurrence of the alleged errors. *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008). Second, we only consider arguments that are not repetitive of briefing. RAP 10.10(a). Third, we decline to consider issues that rely on facts or evidence outside the record, as such claims must be raised in a PRP, not through an SAG. *Alvarado*, 164 Wn.2d at 569.

In his SAG, Mr. Padgett largely repeats arguments that were already advanced through his attorney regarding the DOC's destruction of his client file and the resulting loss of potentially important evidence, including the missing jail call recording. We decline to consider those arguments to the extent they are repetitive of his opening and reply briefs. *See* RAP 10.10(a).

To the extent Mr. Padgett attempts to raise separate claims that the prosecutor delayed in transmitting the trial court's order that Attorney Raber produce the client files to Attorney Thompson, and that additional unknown exculpatory material may have also been destroyed or lost, those arguments do not warrant relief. The suggestion that there may have been other helpful or exculpatory materials among the destroyed files is speculative and depends on facts outside the present record. Likewise, any claim that the prosecutor's timing caused or contributed to the destruction of the files would require factual development beyond what is contained in the record before us. As a result, these claims must be raised in a separate PRP. *See Alvarado*, 164 Wn.2d at 569.

No. 39016-1-III
*State v. Padgett*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Staab, C.J.

_____
Hill, J.